UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| In re: Information Associated with w***********1@gmail.com That Is Stored at Premises Controlled by Google, Inc.<br><br>In re: A Wireless Telephone Assigned Telephone Number (615) ***-****, Believed to Be Used by William Andrew Ogles. | Case No. 3:24-mj-04250<br>Case No. 3:24-mj-04276<br><br>Magistrate Judge Luke A. Evans |

**MEMORANDUM ORDER**

Congressman Andy Ogles (Ogles) was the subject of two search warrants issued in 2024 concerning allegations of campaign finance irregularities. (Case No. 3:24-mj-04250 (the 4250 Case); Case No. 3:24-mj-04276 (the 4276 Case).) Earlier this year, the Government returned to Ogles property seized when executing the search warrants; the Government also decided not to pursue any further criminal investigation. The miscellaneous cases were unsealed in 2024 except for the search warrants themselves and the respective applications for their issuance. Intervenor Scripps Media, Inc. (Scripps) now seeks to unseal the search warrant materials and has filed a motion[1] asserting that the common-law right of access to judicial documents justifies that unsealing. Ogles opposes unsealing because of the potential damage to privacy interests from "the permanent, unanswerable publication of accusations the government itself declined to stand behind in the form of an actual criminal charge." (4250 Case, Doc. No. 32 at 2.)

For the reasons below, the Court will grant the motion in part.

---

[1] Scripts technically has filed two motions—one in each miscellaneous case (4250 Case, Doc. No. 27; 4276 Case, Doc. No. 26)—but the motions are identical. For the sake of simplicity, the Court will refer to both motions collectively in the singular.

## I. Background

### A. Publicly Available Information

These combined matters concerned an investigation into whether Ogles violated any criminal statutes when he allegedly omitted or misrepresented required information in his financial disclosure statements or Federal Election Commission (FEC) candidate committee reports. On January 9, 2024, the Campaign Legal Center submitted a complaint about Ogles to the United States House of Representatives Office of Congressional Ethics, now known as the Office of Congressional Conduct (OCC). *CLC Complaint to Office of Congressional Ethics Regarding Rep. Ogles' Financial Disclosure Violations*, https://campaignlegal.org/sites/default/files/2024-01/Ogles%20Complaint%20FINAL.pdf (last visited Sep. 4, 2026). In the complaint, the Campaign Legal Center requested an investigation, asserting that "Rep. Ogles' financial disclosure statements do not include the assets that he purportedly used to personally loan $320,000 to his campaign committee in April 2022. He also did not report a $700,000 line of credit that he apparently opened in September 2022, according to bank records." *Id.* at 1.

OCC opened an investigation, and on May 15, 2024, it interviewed "Witness 1," who up to that point had been Ogles's campaign treasurer for about two years. *OCC Report and Findings Exhibits*, https://wordpress-1275988-6249768.cloudwaysapps.com/wp-content/uploads/2025/01/OCE-Report-and-Findings-Exhibits-1.pdf, Ex. 2 at 6 (last visited Sep. 4, 2026). Witness 1 testified that a loan of $320,000 appearing in the July 15, 2022 quarterly campaign report was reported as a line of credit secured by Ogles's home. *Id.* at 13. Witness 1 testified further about access to bank accounts and bank statements for the campaign. *Id.* at 20–25. As to why a campaign deposit initially reported as $320,000 wound up being only a $20,000 transfer from a personal account, Witness 1 guessed that "[i]t just looks better when you have more money, right, and scare away

the competition and buy the primary. That's my best guess, but I—I don't know." *Id.* at 28. Witness 1 was not aware of any other loans that Ogles made to his campaign. *Id.* at 32.

Also on May 15, 2024, OCC interviewed "Witness 2," Ogles's Chief of Staff and campaign manager at that time. Witness 2 "never knew the financial state of the campaign since the entirety of the time that I was working for it. My role was more driven at volunteer management, volunteer coordination, day-to-day operations on where we pitch him on the ground, logistics of getting him there, comms, that type of stuff." *Id.* Ex. 3 at 7. Witness 2 had no knowledge of the $320,000 loan beyond what was reported in the media. *Id.* at 7. Witness 2 also had no personal knowledge that would confirm whether Ogles actually opened a line of credit secured by his home. *Id.* at 49.

On June 20, 2024, OCC voted to issue a report to the House Ethics Committee recommending further investigation "because there is substantial reason to believe that Rep. Ogles omitted or misrepresented required information in his financial disclosure statements or FEC candidate committee reports." OCC Report No. 24-3057, https://wordpress-1275988-6249768.cloudwaysapps.com/wp-content/uploads/2025/01/OCE-Report-and-Findings.pdf, at 1 (last visited Sep. 4, 2026). In the report, OCC summarized discrepancies in Ogles's campaign reports and noted that "Rep. Ogles's financial disclosures, both as a candidate and a Member, do not identify assets, liabilities, or income sufficient to substantiate the reported $320,000 loan." *Id.* at 16. OCC summarized an assertion from Ogles's counsel that there was a $700,000 line of credit that was not disclosed but that was used to purchase real property that was sold later. *Id.* at 17. OCC recommended further investigation because "[i]n the absence of accurate financial disclosure reports and without cooperation from Rep. Ogles, the OCE was unable to determine whether Rep. Ogles's alleged $20,000 loan to his campaign was made from his personal funds or came from another source representing an excessive contribution." *Id.* at 18. Press coverage summarizing the

OCC report noted that Witness 2, the campaign manager, was not identified, but the same coverage suggested the identity of Witness 1, the campaign treasurer: "Nashville car dealership magnate Lee Beaman served as Ogles' treasurer early in his campaign before being replaced by Thomas Datwyler." *U.S. House ethics board calls for more investigation of Tennessee congressman*, Chattanooga Times Free Press, Jan. 4, 2025 (LEXIS).

In August 2024, press coverage reported the FBI seizure of Ogles's cell phone and how the seizure likely was connected to a campaign-finance investigation. *See, e.g.*, Emily Brooks, *Rep. Ogles says FBI took phone day after primary win amid campaign finance scrutiny*, CBS-19 WHNT (Huntsville, Ala.), Aug. 6, 2024 (LEXIS); *Ogles campaign finance error was a mistake or a lie*, The Tennessean (Nashville, Tenn.), Aug. 17, 2024 (LEXIS). On September 4, 2024, Magistrate Judge Newbern unsealed both of these preliminary miscellaneous cases except for the warrants and warrant applications. (4250 Case, Doc. No. 6; 4276 Case, Doc. No. 4.) All subsequent filings in the cases have been public, including the Government's decision to return Ogles's property without reviewing it. *See also, e.g.*, Adam Friedman, *Columbia U.S. Rep. Andy Ogles says U.S. DOJ has returned his phone, signaling end of investigation*, Tennessee Lookout, May 6, 2026 (LEXIS). In summarizing the publicly available information related to the cases, the Court takes no position on the substance of any publicly available allegation or opinion concerning Ogles or his campaign finances. The point of the summary is only to contrast publicly available information with information that remains sealed, as described below.

### B. *In Camera* Review of Sealed Information

The Court has conducted an *in camera* review of the search warrants and their corresponding applications. The warrants and applications contain little substantive information that is not already publicly known. For example, the warrants and applications specify that the FBI's investigation concerned possible violations of 18 U.S.C. §§ 1001, 1519, and 371. The sealed

papers contain some personal information that would need redaction upon unsealing. In all other substantive respects, however, the sealed papers more or less track the narrative in the report and the exhibits that OCC submitted to the House Ethics Committee.

### C. Motion to Intervene and to Unseal

Scripps filed its motion to intervene and to unseal on August 13, 2026. Scripps argues that it has standing to intervene as a media organization contesting the sealing of judicial documents that are of significant public interest. (4250 Case, Doc. No. 28 at 7–8.) As for unsealing, Scripps asserts the common-law right of access and argues that the public's "need for transparency is particularly pronounced, because the warrants at issue authorized the seizure of property and information from a public official and member of the legislative branch." (*Id.* at 11.) According to Scripps, the public "has a powerful interest in evaluating the basis for the Government's conclusion—and this Court's—that probable cause existed to believe seizing property from a sitting U.S. Congressman would reveal evidence of a federal crime." (*Id.* at 12.) At the same time, because Ogles "has repeatedly called into question the executive branch's motivations and justifications for the search, both before this Court and in public statements and press conferences" (*id.*), the public "has an equally strong interest in evaluating potential misconduct by federal law enforcement." (*Id.*; Doc. No. 33 at 2–3.) To the extent that the Government might have argued in the past that unsealing would have jeopardized an investigation, Scripps argues now that the end of the investigation, the unsealing of the rest of the cases, and the OCC report combine to diminish any concerns about privacy interests or about revealing possible theories of prosecution. (4250 Case, Doc. No. 28 at 14–15.) Scripps represented that the Government "took no position on the relief requested herein but indicated that it may seek to redact certain portions of the Warrant Materials in the event disclosure is ordered." (4520 Case, Doc. No. 27 at 2.)

Ogles opposes unsealing in all respects. Apparently out of concern that the sealed papers contain more information than the Court found in camera, Ogles argues that the sealed papers "are the government's unsubstantiated, one-sided narrative, drafted by an interested federal agent, submitted under seal, measured against the lowest evidentiary standard known to criminal procedure, and never once tested by cross-examination, rebuttal, or judicial factfinding in an adversarial proceeding." (4250 Case, Doc. No. 32 at 2.) Ogles accuses the Government of taking the irregular position of not opposing unsealing here when it "regularly opposes unsealing search warrant materials." (*Id.* at 3.) Ogles distinguishes public access to adversarial litigation documents from access to search warrant materials and argues that any right of access to the latter is far more limited. (*Id.* at 6–7.) Ogles argues that his privacy interests are strong here because the investigation has concluded and he would have no judicial forum in which to vindicate himself against any innuendo that the papers might contain. (*Id.* at 10.) Ogles additionally expresses the concern that the sealed papers "contain information identifying individuals who have never been publicly associated with this investigation—people who hold no office, sought no press conference, and made no public statement." (*Id.* at 32.) Finally, if the Court were inclined to unseal then Ogles requests, in the alternative, "(1) that the Court review the materials *in camera*; (2) that Congressman Ogles be permitted to propose redactions and be heard on them before any disclosure; and (3) at a minimum, all names and identifying information of uncharged third parties, and all allegations of uncharged conduct, be redacted." (*Id.* at 13.)

## II. Discussion

Under the common-law right of access, courts recognize a general public right to inspect judicial records and documents, subject to the courts' power to supervise their records and files to prevent usage for improper purposes. *See Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (1978). Courts have considerable discretion to manage common-law access, case by case, "in light of the

relevant facts and circumstances of the particular case." *Id.* at 599; *see also United States v. Sealed Search Warrants*, 868 F.3d 385, 395–96 (5th Cir. 2017) ("A case-by-case approach to pre-indictment warrant materials gives the district court discretion in balancing the legitimate interests *against* public access against the public's interests *supporting* access."); *Indianapolis Star v. United States (In re Fair Fin.)*, 692 F.3d 424, 433 (6th Cir. 2012) (affirming denial of First Amendment right to access search warrant proceedings but noting in dicta that "the common law right of access to judicial documents may in some situations permit access to search warrant proceedings . . . . if the district court in its discretion, as supervisor of its own records and files, finds that the public's right to know outweighs interests of privacy in sealing a particular document") (citation omitted). "Affidavits in support of seizure or search warrants are central to a court's probable cause determination. These documents clearly fall within the definition of 'judicial documents' and public access to them facilitates public monitoring of the various government agencies and branches." *United States v. All Funds on Deposit at Wells Fargo Bank*, 643 F. Supp. 2d 577, 582 (S.D.N.Y. 2009) (citations omitted); *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 140 n.3 (2d Cir. 2016) (noting that "a document is judicial not only if the judge actually relied upon it, but also if the judge should have considered or relied upon it, but did not") (citations omitted); *Balt. Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989) (search warrant affidavits are judicial records).

No formula or precise definition governs the common-law right of access, but consideration of the right has evolved to start with a presumption in favor of access and then to weigh that presumption against factors such as 1) a court's supervisory powers; 2) how much the public will benefit from the incremental gain in knowledge compared to information publicly known; 3) any danger to named parties, potential parties, or other people referenced in the

materials in question; 4) "the possibility of improper motives on the part of the media such as promoting public scandal or gratifying private spite"; and 5) "any special circumstances in the particular case." *United States v. Beckham*, 789 F.2d 401, 409 (6th Cir. 1986) (citations omitted); *accord In re Cincinnati Enquirer*, No. 22-3681, 2023 U.S. App. LEXIS 4581, at *6 (6th Cir. Feb. 24, 2023) (unpublished opinion) (citations omitted).[2] Other factors that can be considered include the likelihood of violating grand-jury secrecy; "the identity of unnamed subjects not yet charged would be revealed; there may be mistaken notions concerning who might and might not be cooperating with the government or who may be subjects; there may be misunderstandings about the parameters of the government's investigation; the privacy of the innocent and the implicated would be threatened; and the cooperation of present and potential witnesses could be compromised or influenced." *In re EyeCare Physicians of Am.*, 100 F.3d 514, 519 (7th Cir. 1996).

With respect to the initial presumption of public access, "the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995). The presumption of public access for search warrants and search warrant materials is strong. *See United States v. Cohen*, 366 F. Supp. 3d 612, 621 (S.D.N.Y. 2019) (citations omitted).

Here, the factors that affect the common-law right of access weigh in favor of unsealing. While the incremental gain in knowledge from unsealing will not be large compared to information

---

[2] Though not discussed explicitly, this case and *In re Fair Finance* assume that media organizations like Scripps have standing to assert the common-law right of access. The Court accordingly accepts that Scripps has standing, and Ogles does not challenge standing.

publicly known, the public has a strong interest in confirming that the search warrant applications in question did not suggest any investigation wider than what has already been addressed in the OCC report. *Cf. In re WP Co. LLC (Post I)*, No. 16-mc-351, 2016 U.S. Dist. LEXIS 55924, at *4 (D.D.C. Apr. 1, 2016) (partial disclosure of search warrant materials warranted, subject to redactions, where investigation concluded and "the prosecutions arising from this investigation [are] widely known"); *In re Four Search Warrants*, 945 F. Supp. 1563, 1569 (N.D. Ga. 1996) (ordering release of redacted search warrant affidavits for reasons including that "there is the question of Mr. Jewell's reputation and his ability to obtain employment in his chosen field, and the public judgment of him and his actions is best served by full knowledge of the information that led to his being a suspect"). The Government has taken no position on unsealing, and Scripps is not seeking unsealing for any morbid interest or other improper motive. *Cf. Cohen*, 366 F. Supp. 3d at 626 (release of names of financial institutions that were targets of alleged false statements did not cater "to a morbid craving for that which is sensational and impure") (internal quotation marks and citations omitted). With some redactions, unsealing will pose no danger to Ogles or to anyone else. *Cf. In re WP Co. LLC (Post II)*, 201 F. Supp. 3d 109, 120 (D.D.C. 2016) (denying follow-up request for additional unsealing of search warrant materials, where public interest outweighed by impact of "undisclosed and uncharged allegations levied against private citizens"); *In re Search Warrant*, No. M-3-94-80, 1996 WL 1609166, at *4 (S.D. Ohio Aug. 20, 1996) (ordering unsealing of search warrant materials but with redactions to protect previously unidentified third parties). As for other special or miscellaneous circumstances, the Government has chosen not to pursue any criminal proceedings in relation to the search warrant applications. *Cf. Matter of Search Warrants for Nat'l Builders Corp.*, 833 F. Supp. 644, 646 (N.D. Ohio 1993) (denying unsealing of search warrant materials where "[v]irtually every page of the affidavit

contains references to conversations and events, and reveals the nature and scope of the on-going government investigation, including individuals not the subject of the search warrant"). If the House Ethics Committee chooses to pursue its own investigation then that investigation will occur publicly. Under these circumstances, there is no reason to set aside the presumption of public access except to accord special status to search warrant applications in themselves. "To say that affidavits in support of search warrant are exempt from public access solely because they are affidavits for search warrants creates for them a curious and irrational exemption from the public access afforded every other document filed with the Court." *In re Search Warrant*, No. 00-138M-01, 2000 WL 1196327, at *1 (D.D.C. July 24, 2000).

The only issue that remains is redaction. Ogles requested, as an alternative remedy, that he have a chance to propose redactions, but he did not cite to any authority demonstrating that the target of a search warrant may propose redactions. (4250 Case, Doc. No. 32 at 13.) Courts that unseal search warrant materials usually solicit proposed redactions from the Government and then "undertake an individualized analysis of whether the proposed redactions are or are not sufficient to protect the privacy, reputational, and safety concerns that might make the interest in non-disclosure compelling, and of whether the proposed redactions are narrowly tailored to balance the competing interests." *United States v. Suppressed*, No. 22 M 1000, 2024 U.S. Dist. LEXIS 115461, at *26–27 (N.D. Ill. July 1, 2024) (citations omitted); *see also In re PennLive*, No. CV 1:22-MC-00756, 2024 WL 1619278, at *5 (M.D. Pa. Apr. 15, 2024) (directing unsealing of search warrant materials but permitting Government to file proposed redactions *ex parte* and under seal and "to explain their justification for each redaction to the fullest extent possible"); *Cohen*, 366 F. Supp. 3d at 634 (giving Government three weeks to file a sealed, *ex parte* copy of proposed redactions); *Post I*, 2016 U.S. Dist. LEXIS 55924, at *7 (giving Government one week to file proposed

redactions under seal); *In re Search Warrant*, 2000 WL 1196327, at *2 (giving Government two weeks to file proposed reductions under seal). The Government will have an opportunity to file sealed, *ex parte* papers proposing appropriate redactions in each miscellaneous case. The papers will include a proposed redacted version of Doc. No. 1 in each of the miscellaneous cases. This directive is equivalent to leave already granted under Local Rule 5.03(b)(1); the Government may proceed directly to Local Rule 5.03(b)(2) and (e).

**III. Conclusion**

For all of the foregoing reasons, the Court GRANTS IN PART Scripps's twin motions to intervene and to unseal. (4250 Case, Doc. No. 27; 4276 Case, Doc. No. 26.) On or before **September 25, 2026**, the Government will file sealed, *ex parte* papers proposing appropriate reductions in each miscellaneous case and including a proposed redacted version of Doc. No. 1 in each of the miscellaneous cases. Doc. No. 1 in each case will remain sealed as is, pending submission of proposed redactions and further orders of the Court.

It is so ORDERED.

LUKE A. EVANS
United States Magistrate Judge