# UNITED STATES DISTRICT COURT

for the

__________ District of __________

| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>A WIRELESS TELEPHONE ASSIGNED TELPHONE NUMBER [redacted], BELIEVED TO BE USED BY WILLIAM ANDREW OGLES | )<br>)<br>)<br>)<br>)<br>) | Case No. 24-mj-4276 |
|---|---|---|

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the Middle District of Tennessee, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 1001 | False statements |
| 18 USC 1519 | Falsification of records |
| 18 USC 371 | Conspiracy |

The application is based on these facts:
See attached Affidavit in Support

☐ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Brent Hayden
*Applicant's signature*

Special Agent Brent Hayden, FBI
*Printed name and title*

Attested to by the applicant in accordance with the require[...] R. Crim. P. 4.1 by
____________________ (s[...] c means).

Date: July 30, 2024

*Judge's signature*

City and state: Nashville, TN

[...]stair E. Newbern, U.S. Magistrate Judge
*Printed name and title*



Print Save As... Attach Reset

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PERSON OF WILLIAM ANDREW OGLES AND A WIRELESS TELEPHONE ASSIGNED TELPHONE NUMBER [redacted], BELIEVED TO BE USED BY WILLIAM ANDREW OGLES | Case No. 24-mj-4276<br>**Filed Under Seal** |

**STATEMENT IN SUPPORT OF**
**APPLICATIONS FOR TWO SEARCH WARRANTS**

I, BRENT A. HAYDEN, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this statement in support of applications for two search warrants: (a) a warrant to search the person of WILLIAM ANDREW OGLES ("OGLES") to seize a wireless telephone assigned telephone number [redacted], believed to be a Samsung Galaxy S21 used by OGLES (the "SUBJECT DEVICE"); and (b) a warrant to search the SUBJECT DEVICE. OGLES, a Caucasian male with a date of birth of [redacted], is described in more detail in Attachment A-1. The SUBJECT DEVICE is described in more detail in Attachment A-2. The application for the warrant to search OGLES requests authorization to seize the SUBJECT DEVICE only, as described in more detail in Attachment B-1. The application for a warrant to search the SUBJECT DEVICE, seeks authorization to retrieve electronically stored information and other information and evidence, as further described in Attachment B-2.

2. I am a Special Agent with the Federal Bureau of Investigation and have been since August of 2016. As a Special Agent, I have had substantial training and experience in investigating and prosecuting public corruption and election fraud matters. In the course of my duties, I have received training in evidence handling, working with confidential informants, physical

surveillance, investigating a wide variety of frauds, forfeiture, search and seizure warrants, and arrest procedures. I have executed, and have assisted other agents in the execution of, search warrants, including for information associated with email, in investigations related to public corruption, civil rights, violent crime, and crimes against children.

3. The facts in this statement come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This statement is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4. As set forth in detail below, the evidence in possession of the FBI to date establishes probable cause to believe that OGLES, a resident of the Middle District of Tennessee, and others—including [redacted] and [redacted]—falsely reported making $300,000 of candidate loans to OGLES's federal campaign for the U.S. House of Representatives, in violation of 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1519 (falsification of records), and 18 U.S.C. § 371 (conspiracy) (collectively, the "SUBJECT OFFENSES"). There is, moreover, probable cause to believe that the SUBJECT DEVICE contains evidence of the SUBJECT OFFENSES. Based on my training and experience, I know that when OGLES is not in his personal residence, the SUBJECT DEVICE is likely to be on OGLES's person, to include any bag, briefcase, backpack, or luggage that he has in his possession. Thus, this application seeks authorization to search OGLES for the SUBJECT DEVICE and then search the SUBJECT DEVICE for evidence of the SUBJECT OFFENSES.[1]

---

[1] On July 12, 2024, Magistrate Judge Alistair Newbern issued search warrants for information associated with the Google accounts w[redacted]1@gmail.com and [redacted], which are associated with OGLES and [redacted], respectively. *See* 24-MJ-4250; [redacted]. The warrants authorized the government to search and seize from those

## PROBABLE CAUSE

### I. Legal Background and Summary of Investigation

5. Generally, the Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30101 *et seq.* ("FECA"), limits corruption and the appearance of corruption in the election of candidates for federal office and provides for public disclosure of the financing of federal election campaigns.

6. The Federal Election Commission (hereinafter, "FEC") was a department or agency of the United States, located in Washington, D.C., with jurisdiction to administer and enforce the Election Act. The FEC was responsible for receiving and making available to the public specific, accurate information about the amounts and sources of contributions to federal candidates and political committees.

7. The Election Act and the FEC required authorized campaign committees to file periodic, accurate reports of receipts and disbursements identifying, among other things, each person that made a contribution to such committee during the relevant reporting period whose contribution or contributions had an aggregate amount or value in excess of $200 within, respectively, the election cycle or the calendar year, together with the date and the amount of any such contribution.

### II. OGLES's Campaign Falsely Reports $300,000 in Candidate Loans.

8. OGLES is a sitting member of the U.S. House of Representatives, representing Tennessee's 5th Congressional District, at least part of which is located within the Middle District

---

accounts evidence of the SUBJECT OFFENSES existing from January 1, 2022, through the date of the warrant. *See id.*

of Tennessee. OGLES was first elected to Congress on or about November 8, 2022, and took office on or about January 3, 2023.

9. OGLES's principal federal campaign committee for the 2022 federal election cycle was Ogles for Congress (hereinafter, "the Committee").

10. On or about April 6, 2022, the Committee filed a Statement of Organization with the FEC. The Committee listed [redacted] as the campaign treasurer, [redacted].

11. [redacted].

12. [redacted]

13. [redacted].

14. [redacted]

15. On or about May 5, 2022, OGLES's campaign issued a press release claiming that the campaign had raised $453,000 in its first 30 days. On or about May 11, 2022, OGLES's campaign website posted the press release.[2] The website included a post accompanying the release, which stated, "The Ogles campaign says none of his fundraising total came in the form of loans and that all contributions were from within Tennessee." The post also stated, "Ogles didn't officially enter the contest until the end of the Federal Election Commission's most recent reporting deadline, so he won't have to make official disclosures until July 15 — 20 days before the primary."

16. On or about July 23, 2022, the Committee filed its July 15 Quarterly Report with the FEC, covering the time period from April 1, 2022, through June 30, 2022. In the summary page of receipts, the Committee reported that it had received $247,087 in contributions and $320,000 in loans made or guaranteed by the candidate during the quarter—the first of the Committee's existence. It reported having made $58,288.39 in expenditures, for total cash on hand of $508,798.61.

17. Schedule A of the report, which listed itemized receipts, stated that OGLES made a $320,000 contribution to the Committee on April 15, 2022. Schedule C of the report, which listed loans, indicated that OGLES's contribution to the Committee was a personal loan. The Committee stated that the "Original Amount of the Loan" was $320,000, that the "Cumulative Payment to Date" was $0, and the "Balance Outstanding at Close of this Period" was $320,000, with the term of the loan incurred April 15, 2022, and due December 31, 2022.

18. OGLES electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly below

[2] https://andyogles.com/ogles-camp-announces-453k-for-5th-district-bid-in-first-30-days/

the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

19. [redacted]

20. On or about July 23, 2022, the Committee filed its Pre-Primary Report with the FEC, covering the time period from July 1, 2022, through July 15, 2022. The Committee reported that it had received net non-candidate contributions to date of $264,402 and had net expenditures of $301,063.87. Despite reporting that it had expended more money than it had received in non-candidate contributions, the Committee was still able to report cash on hand of $283,338.13, based on the purported $320,000 loan from OGLES. OGLES electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

21. On or about August 4, 2022, OGLES won the Republican primary with 35.4% of the vote, with the next two candidates receiving 24.9% and 21.1%, respectively.

22. On or about August 25, 2022, the Committee filed a Statement of Organization with the FEC, replacing [redacted] as treasurer with [redacted].

23. On or about October 15, 2022, the Committee filed its October 15 Quarterly Report with the FEC, covering the time period from July 15, 2022, through September 30, 2022. The

Committee reported $454,636 of cash on hand, including the purported $320,000 loan. [redacted] electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

24. On or about November 8, 2022, OGLES won the general election with 55.8% of the vote, with the next candidate receiving 42.3%.

25. On or about January 30, 2023, the Committee filed its Year-End Report with the FEC, covering the time period from November 29, 2022, through December 31, 2022. The report listed the $320,000 loan but indicated that the Committee had made no payments to OGLES, despite the due date still listed as December 31, 2022. [redacted] electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

26. On or about April 15, 2023, the Committee filed its April 15 Quarterly Report with the FEC, covering the time period from January 1, 2023, through March 31, 2023. The report listed the $320,000 loan under the same terms that expired December 31, 2022, with no payments made. [redacted] electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

27. On or about August 31, 2023, the FEC issued a Request for Additional Information ("RFAI") to the Committee. The RFAI stated, ""Your report includes loans owed to the candidate with due dates of 12/31/2022. Please note that an overdue loan from the candidate's personal funds may be considered a contribution from the candidate if new terms are not disclosed. (11 CFR § 104.3(d))."

28. On or about September 13, 2023, the Committee filed an amended April 15, 2023, Quarterly Report, changing the due date for the loan to "NONE." The report stated that the Committee had made no payments to OGLES. The amount of the loan was still listed as $320,000. [redacted] electronically signed the report, certifying that he had "examined [the] report and to the best of [his] knowledge and belief it is true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

29. On or about October 5, 2023, the FEC announced a negotiated settlement with the Committee for a financial penalty of $5,750 based on reporting errors and FECA violations during the 2021-22 federal election cycle. The cited errors included, among other items: the failure to file and late filing of reports; excessive, prohibited, and other impermissible contributions/transfers; and failure to provide supporting schedules. The FEC's Reports Analytics Division ("RAD") additionally referred the Committee for amending its 2022 October Quarterly Report on January 5, 2023, to disclose additional receipts, totaling $89,877.25, and for the failure to timely file 48-Hour Notices for the 2022 primary election, totaling $15,800, and for the 2022 general election, totaling $13,700. Nothing in the settlement addresses the purported $320,000 loan or otherwise indicated that the FEC was aware of any inaccurate statements related to it beyond the original repayment term expiring.

30. On or about May 22, 2024, the Committee filed at least 11 amended Reports with the FEC, dating back to the July 2022 Quarterly Report in which the Committee first reported that it had received $320,000 in candidate loans. The amended reports reduced the amount of candidate loans from $320,000 to $20,000. The reports also reduced the Committee's cash on hand amounts reflected in each report by approximately $300,000. [redacted] electronically signed the Reports, certifying that he had "examined [the] report[s] and to the best of [his] knowledge and belief [they are] true, correct and complete." Directly below the signature block was a note stating, "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

31. On or about May 23, 2024, OGLES issued the following statement, in which he admitted that, for years, the Committee has falsely inflated loans that it had received from OGLES by $300,000:

a. "At the beginning of the 2022 campaign cycle, I pledged $320,000 to use toward my own campaign efforts if needed. I'm not a wealthy man who can self-fund the millions of dollars needed to run a congressional campaign. I am a grassroots representative, and I pledged everything I own to run for the honor of representing Tennessee's Fifth Congressional District. That $320,000 pledge comprised several documented assets, including bank and retirement accounts, which I was ready to personally risk for the chance to fight for Middle Tennessee. While we only needed to transfer $20,000, unfortunately, the full amount of my pledge was mistakenly included on my campaign's FEC reports. The amendments we filed yesterday were done in consultation with attorneys and FEC reporting experts to begin the process of ensuring my FEC reports and Financial Disclosures accurately reflect the

circumstances of my original pledge. I will always be a representative of the people, and I will never stop fighting to champion their conservative cause."[3]

**III.** [redacted]

32. On or about January 30, 2023, and May 15, 2023, OGLES filed mandatory financial disclosures with the U.S. House of Representatives. OGLES listed some investment properties and retirement accounts, but no other assets or interest-bearing bank accounts that could support the purported $320,000 loan to the Committee.

33. I have reviewed [redacted]

34. [redacted].

35. As stated previously, on or about July 23, 2022, the Committee filed its July 15 Quarterly Report with the FEC. This report covered April 1, 2022, through June 30, 2022. According to the report, the Committee claimed to have received $247,087 in net contributions

---

[3] https://x.com/andyogles/status/1793703913876783529

and $320,000 in candidate loans. It reported $58,288.39 in net expenditures, and $508,798.61 in cash on hand. Those reported figures [redacted]

36. On or about July 23, 2022, the Committee filed its pre-election report for the period of July 1, 2022, through July 15, 2022. According to the filing, cash on hand was $283,338.13. That reported figure [redacted]

37. On or about January 30, 2023, the Committee filed its Year-End Report with the FEC for the time period of November 29, 2022, to December 31, 2022. According to the filing, cash on hand was $397,586.84. [redacted].

38. On or about April 15, 2023, the Committee filed its April 15 Quarterly Report with the FEC for the time period of January 1, 2023, to March 31, 2023. According to the filing, cash on hand was $361,567.45. [redacted]

39. On or about September 13, 2023, the Committee filed an amended April 15 Quarterly Report with the FEC for the time period of January 1, 2023, to March 31, 2023. According to the filing, cash on hand was $398,139.29. [redacted]

40. During the time periods discussed above, [redacted]

[redacted]

## IV. OGLES's Use of the SUBJECT DEVICE

41. As described above, the telephone number associated with the SUBJECT DEVICE is the [redacted]

42. [redacted] I know from my investigation that OGLES was the mayor of Maury County prior to and during his campaign for U.S. House of Representatives. [redacted].

43. [redacted]

44. [redacted] For example:

a. On July 21, 2022, approximately 2 days before the filing of the July 15 Quarterly Report, [redacted]

[redacted]

b. From October 12, 2022, to January 13, 2023, in advance of the October 15 Quarterly Report and the Year-End Report filed on January 30, 2023, [redacted]

c. On February 10, 2024, [redacted] That was less than two weeks after the Committee filed its Year-End Report with the FEC for the time period of October 1, 2023, to December 31, 2023.

d. On April 25, 2024, less than one month before the filing of the May 22, 2024, amended Reports, [redacted] Additionally, between April 8, 2024, and April 25, 2024, [redacted].[4] Based on my training

---

4 [redacted]

and experience, and as further stated below, I know that a wireless telephone can be, and often is, used to send, receive, and store emails.

45. Based on the foregoing, there is probable cause to believe that OGLES has committed the SUBJECT OFFENSES and that evidence of those crimes will be found in the SUBJECT DEVICE.

## TECHNICAL TERMS

46. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an

extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

47. Based on my training, experience, and research, I know that the SUBJECT DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device and PDA. In my training and experience, examining data

stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

48. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

49. *Forensic evidence.* As further described in Attachment B-2, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

50. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

51. *Manner of execution.* Law enforcement seeks permission to search the person of OGLES and seize the SUBJECT DEVICE during the hours between 6:00 am and 10:00 pm. However, for the SUBJECT DEVICE itself, because this warrant seeks permission to examine the device once it is in law enforcement's possession, the execution of the warrant to search the SUBJECT DEVICE itself will not involve the physical intrusion onto a premises or individual.

Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant to search and forensically examine the SUBJECT DEVICE at any time in the day or night.

52. The warrant I am applying for to search the SUBJECT DEVICE would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to the warrant to search the SUBJECT DEVICE. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices

produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. The passcode or password that would unlock the SUBJECT DEVICE is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the SUBJECT DEVICE, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for to search the SUBJECT DEVICE would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of OGLES to the fingerprint scanner of the device; (2) hold the device in front of the face of OGLES and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

53. I submit that this statement supports probable cause for search warrants authorizing the search of the person of OGLES, identified in Attachment A-1, for the SUBJECT DEVICE,

identified in B-1, and authorizing the seizing and search and examination of the SUBJECT DEVICE described in Attachment A-2 to seek the items described in Attachment B-2.

## ATTACHMENT A-2

## PROPERTY TO BE SEARCHED

The property to be searched is a wireless telephone, assigned telephone number [redacted], believed to be a Samsung Galaxy S21 used by WILLIAM ANDREW OGLES ("OGLES"), hereinafter the "SUBJECT DEVICE," which is likely to be located on OGLES's person, including in any bag, briefcase, backpack, or luggage on OGLES's person that could contain a cellular telephone.

## ATTACHMENT B-2

## ITEMS TO BE SEIZED

1. All information on the SUBJECT DEVICE described in Attachment A-2 that constitutes evidence of violations of 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1519 (falsification of records), and 18 U.S.C. § 371 (conspiracy) (collectively, the "SUBJECT OFFENSES"), those violations involving WILLIAM ANDREW OGLES, [redacted], and/or [redacted], from January 1, 2022 to the present, including records pertaining to the following matters:

a. Information concerning Ogles for Congress (hereinafter, "the Committee");

b. Information concerning financial support for the Committee;

c. Information concerning the reports filed by the Committee with the Federal Election Commission (hereinafter, "the FEC");

d. Information concerning OGLES's personal and business finances;

e. Information concerning OGLES's financial disclosures filed with the U.S. House of Representatives;

f. Communications between OGLES, [redacted], [redacted], and/or other individuals identified in the search warrant affidavit concerning political contributions and financial support for the Committee;

g. Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal, activity under investigation described in the affidavit; or (ii) communicated with the SUBJECT DEVICE about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

h. Information that constitutes evidence indicating the state of mind of the user of the SUBJECT DEVICE, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

i. Information that constitutes evidence concerning how and when the SUBJECT DEVICE was accessed or used, to determine the geographic and chronological context of device access, use, and events relating to the crimes under investigation and to the user of the SUBJECT DEVICE;

j. All information, including the content of communications, that constitutes evidence of the criminal activity under investigation;

k. Steps taken in furtherance of the criminal activity under investigation;

l. Any and all evidence indicating in any way a motive to commit any the offenses detailed in this affidavit; and

m. Evidence of user attribution showing who used or owned the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

2. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3. During the seizure and execution of the search of the SUBJECT DEVICE described in Attachment A-2, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of OGLES to the fingerprint scanner of the device; and/or (2) hold the device in front of the face of OGLES and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

4. This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.